341 So.2d 1165 (1976)
Walter J. HARRISON et al.
v.
Augustine ALOMBRO et al.
No. 11076.
Court of Appeal of Louisiana, First Circuit.
December 20, 1976.
Rehearing Denied February 14, 1977.
Writ Refused March 25, 1977.
*1167 C. Ellis Henican, New Orleans, Donald L. Peltier, Thibodaux, for plaintiffs and appellees.
James D. McGovern, Jr., Calvin H. McBride, New Orleans, and John D. Ponder, Metairie, John P. Dowling, George M. Ponder and William J. Lopez, New Orleans, for defendants and appellants.
John P. Dowling, George M. Ponder, William J. Lopez, New Orleans.
Before SARTAIN, ELLIS and PONDER, JJ.
PONDER, Judge.
This is an action to remove clouds from title. Plaintiffs seek to have cancelled certain instruments recorded in the public records by defendants and to enjoin the defendants from asserting any interest that is based on these instruments in the property claimed by plaintiffs. The trial court recognized plaintiffs as owners of the land, declared that the recorded instruments did constitute clouds on the title, and decreed *1168 that these instruments were null and void. The court further enjoined the defendants from asserting any interest in the property based upon the above instruments and from filing any other instruments based upon or emanating from the offending instruments.
The issues are:
1. Propriety of action to remove cloud from title;
2. Prescription;
3. Sufficiency of proof;
4. Recognition of ownership;
5. Propriety of injunctive relief.
We amend and affirm.

ACTION TO REMOVE CLOUDS FROM TITLE
Defendants urge that Louisiana no longer recognizes an action to remove cloud from title. We believe Walmsley v. Pan American Petroleum Corporation, 244 La. 513, 153 So.2d 375 (1963), holding to the contrary, is still the law. The decision was criticized in Verrett v. Norwood, 311 So.2d 86 (La.App. 3rd Cir. 1975), writs denied 313 So.2d 842, but, in denying writs, the Supreme Court purposely avoided an opportunity to overrule Walmsley. We therefore believe that Louisiana continues to have an action to remove cloud from title.
Defendants next contend that, even if we hold that an action to remove cloud from title still exists, the plaintiffs have actually pleaded a possessory action. The nature of a suit is not determined by the caption placed upon it, but rather by the factual pleadings and the prayer. Northern Assurance Company v. Waguespack, 304 So.2d 865 (La.App. 4th Cir. 1975).
The requirements of an action to remove clouds from title are:
(1) Claim of ownership;
(2) Existence of clouds;
(3) Description of property;
(4) Prayer for cancellation of the clouds.
Plaintiffs allege that they are the owners of the property and defendants have recorded certain instruments that act as clouds on their title. The petition contains a description of the property. The prayer is that the instruments be declared null and void and be ordered erased. Plaintiffs evidently carefully brought themselves within the holding of the Walmsley case, supra. Appellants' contention that the action is really a possessory one is without merit.[1]

LIBERATIVE PRESCRIPTION
Defendants claim the trial court erred in overruling their exceptions of liberative prescription of one, three, five, ten and thirty years.
The exception of one year prescription is based upon the contention that the action filed was in reality a possessory action, and must therefore be filed within one year of the date of disturbance. Since we have determined that this is an action to remove clouds from title and not a possessory action, this plea of prescription is without merit.
The exception of thirty years liberative prescription is based upon certain language in the act of sale by which Joseph Harrison, plaintiffs' predecessor in title, obtained the property.[2] Defendants claim *1169 that by this agreement Mr. Harrison assumed the obligation of dispossessing the defendants and their ancestors from the property; and that since he waited more than thirty years before filing suit, the action has prescribed.[3]
It is obvious that the purpose of this paragraph was to relieve the seller of any obligation to remove trespassers or squatters from the property. This intention is made clear by the last clause of the paragraph which states that "this agreement shall in no way otherwise affect the warranty to said property." At any rate, defendants do not show how they could avail themselves of this liberative prescription. Furthermore, as is shown elsewhere in this opinion, we affirm the trial court's finding that the defendants did not maintain continuing possession. There is certainly evidence in the record supporting a conclusion that the Alombros left the property soon after the Harrisons acquired title. Thus eviction proceedings became unnecessary.
The plea of five year prescription is evidently based upon C.C. Art. 3542,[4] but appellants do not show its applicability. Neither do they show how three and ten year prescription apply.
The lower court was correct in overruling defendants' pleas of liberative prescription.

POSSESSION OF THE DEFENDANTS
The defendants attempted to prove that they had been in possession adverse to the world continuously for more than thirty years.[5]
It is not seriously contested that members of the Alombro family had lived at "Pium-Pium," their name for the location, and had fished and trapped the surrounding land until 1929. The extent of their possession is unclear, but it appears they trapped and fished a couple of miles in all directions.
Several defendants testified that members of the Alombro family continued to live and work on the land after the Harrisons brought the property in 1929. Joseph Helmer, who was born at "Pium-Pium" but moved away sometime after marrying, testified that his uncle, Donato Alombro, and his brother, George Helmer, were still living there in 1945; but he said they had moved their families away because of a "mixup" in the land. Ernest Helmer testified that he lived at "Pium-Pium" until 1934, and left Donato and George Helmer living in the camp there.
Thomas Helmer testified that he was born at "Pium-Pium," but left there in 1933. No one ever told him the land belonged to the Harrisons or ordered him off the land. Joseph Silver testified that his uncle Donato Alombro was living in one of the camps in 1939. William Pekinto testified that he trapped with his uncle, Donato Alombro, from 1928 to about 1940, around Bayou Snake, three to four miles from "Pium-Pium."
Only two witnesses testified with some clarity as to the extent of the land trapped by the Alombros. As he testified, Peter Helmer marked the area on a map consisting of all of nine sections and parts of ten others in Ranges 23 and 24 East. Thomas Helmer testified that after 1933 he and his uncle Donato Alombro trapped a smaller *1170 area than had been trapped previously. Although the testimony is not entirely clear, the area he enumerated appears to be nine sections all in Range 23 East.
The evidence of the defendants in regard to possession on the date of filing of suit is somewhat vague, but, perhaps, can be summarized by saying that a number of the Alombro descendants cooperated in building a camp in 1962, which burned, however, in a few weeks; replacement was not made until 1964 and it lasted only until 1965, when it was destroyed by a hurricane. There is no evidence of any corporeal possession in 1963.
William and Walter Harrison both testified that their father bought the property in 1929. Both testified there were several people of Filipino origin on the property at that time. They told these people they could trap the lands for a rental of 35% of their take; but the furs they produced were scarce and of poor quality. The Harrisons asked them to leave and they did so. Walter Harrison said he returned to the land every trapping season thereafter until 1940 and never saw any Alombros or other Filipinos on the land. Shortly after the property was bought he supervised the erection of signs along the property lines as described in the deed, identifying the property as Harrison property; the signs were maintained continuously thereafter.
When William Harrison returned from the service in 1946, Polycarp and Albert Bychurch were occupying the two camps at "Ging-Ging," or "Zing-Zing," the same area the Alombros identified as "Pium-Pium."
Bebe Guidry, who had been the manager of the Harrison lands since 1953, patrolled the land regularly and only once had seen people trapping who were not supposed to be on the land. He ordered them off the land and they did not return. Mrs. Albert Bychurch, whose husband trapped for the Harrisons for many years, beginning in either 1930 or 1931, said she, her husband and Polycarp Bychurch, her husband's brother, lived in two camps on a small hill at a place she called "Ging-Ging." She said they were the only ones who lived there, and she never saw any people who looked like Filipinos in the area.
Antoinette Bychurch Cheramie, daughter of Polycarp Bychurch, testified that her father and her uncle, Albert Bychurch, lived in two camps at "Ging-Ging" in the 1930's. She stayed with her father until her marriage in 1934, and no one else lived in those two camps.
Jason LaFrance testified that he was in charge of running the lands after the Harrisons purchased them in 1929, and that he placed trappers on the lands and watched out for trespassers. He said there were two houses near a cemetery where he placed trappers for the Harrisons. These trappers were Albert and Polycarp Bychurch, a family called Martin and another man named LeBlanc, among others. He said he never saw any of the Alombro family during the time he ran the lands. Louis Acosta remembered meeting several people named Alombro shortly after he went to work for the Harrisons in 1929. He said the Alombros left the houses they were living in before the end of the 1929-30 season because of the poor furs they were trapping. He also said Notilio Hebert moved into one of the houses thereafter, and the Alombros did not return.
The trial judge did not give us the benefit of reasons for judgment, but it is clear he believed the plaintiffs' testimony. The reasonable inference to be drawn from the judgment is that the judge did not believe the defendants had shown continuous possession of the property. There is more than adequate evidence to support this finding and it should not be disturbed. See Billiot v. Bourg, La., 338 So.2d 1148 (1976).

BURDEN OF PROOF
The plaintiff's burden of proof in a petitory action or an action to remove cloud from title depends upon whether the defendants are in possession of the property on the date of filing suit. See LSA-C.C.P. Article 3653, Pure Oil Company v. Skinner, La., 294 So.2d 797 (1974), and Verrett v. Norwood, supra. Since the defendants *1171 were not in possession when suit was filed, the Harrisons need prove only better title than the Alombros. We believe this was proved.
A certified copy of an act of sale from Leonard A. Andrus and Frank W. Grant to Joseph de Fuentes Harrison, plaintiffs' father, purporting to convey the entire 22,437.92 acres in question to Mr. Harrison, was introduced. Certified copies of judgments of possession in the successions of Joseph de Fuentes Harrison and his wife, Marie Alma Levis Harrison, were also filed into evidence. This uncontroverted evidence is prima facie proof that plaintiffs are the owners of the property. Since defendants only proof of ownership was the rejected plea of thirty years adverse possession, we believe plaintiffs have proved sufficient title to meet the requirements for an action to remove cloud from title.

ADMISSION OF EVIDENCE OF TITLE
Defendants claim the trial judge erred in allowing evidence and exhibits, to show title and otherwise, to be introduced into the record when they had not been pled in the petition. It is defendants' contention that once plaintiffs filed into the record their title as set forth in the petition, and introduced the instruments purporting to be the clouds, all other evidence as to title was beyond the scope of the pleadings.
Title is one of the requirements for this type of action even though it is not the central issue. Evidence of title is therefore relevant. Furthermore, defendants had pled adverse possession in excess of thirty years, and plaintiffs could not file replicatory pleadings. Verrett v. Norwood, supra. We believe therefore evidence as to title was relevant and properly admitted.

RECOGNITION OF OWNERSHIP
Appellants complain, too, that the lower court improperly recognized plaintiffs as record owners of all the property, inclusive of that claimed by the defendants. We have mentioned at other points in this opinion that ownership is one of the requirements in an action to remove cloud from title. While we believe this to be no more than a finding by the court that plaintiffs had sufficient title to grant this relief, we feel constrained to agree with appellants. Nowhere in the pleadings do plaintiffs pray to be recognized as record owners. We therefore amend the judgment to delete any reference to plaintiffs as record owners of the property.

INJUNCTIVE RELIEF
Finally, appellants assert that the trial court erred in granting injunctive relief in this action. To our knowledge, there is no jurisprudence as to whether injunctive relief is allowed in an action to remove cloud from title.[6] However, we believe that injunction is an additional method of relief consistent with an order to remove a cloud.
Without a specific prohibition, we believe injunctive relief should be available in this type of case, assuming the applicant meets the standards set forth in Article 3601.[7]
We are unable to say that the trial court was in error in enjoining the defendants from asserting any interest in the property based upon the recorded instruments.
The judgment of the trial court is therefore amended to delete all reference to plaintiffs as record owners; in all other respects it is affirmed. Defendants-appellants are cast with all costs.
AMENDED AND AFFIRMED.
NOTES
[1] C.C.P. Art. 3658. Same; requisites

"To maintain the possessory action the possessor must allege and prove that:
(1) He had possession of the immovable property or real right at the time the disturbance occurred;
(2) He and his ancestors in title had such possession quietly and without interruption for more than a year immediately prior to the disturbance, unless evicted by force or fraud;
(3) The disturbance was one in fact or in law, as defined in Article 3659, and
(4) The possessory action was instituted within a year of the disturbance."
[2] The pertinent language in this act of sale stated:

"It is further understood and agreed that the purchaser shall and does hereby assume the responsibility of obtaining possession of said property, and that said purchaser shall and hereby assumes the obligation of instituting and prosecuting to final conclusion at his own expense, all legal proceedings that may be necessary to dispossess any trappers, squatters or trespassers who may be presently on the property this agreement shall in no way otherwise affect the warranty to said property."
[3] LSA-C.C. Article 3548:

"All actions for immovable property, or for an entire estate, as a succession, are prescribed by thirty years."
[4] C.C. Art. 3542:

"The following actions are prescribed by five years:
That for the nullity or rescission of contracts, testaments or other acts.
That for the reduction of excessive donations.
That for the rescission of partitions and guarantee of the portions.
This prescription only commences against minors after their majority."
[5] Defendants very carefully stated in their answers, that they had no intent to put the title at issue and so convert the action into a petitory one; but title is at issue in an action to remove cloud from title even though incidentally. See Walmsley, supra.
[6] An injunction was prayed for in Daigle v. Pan American Production Company, 236 La. 578, 108 So.2d 516 (1958), but the issue had become moot by the time of hearing.
[7] LSA-C.C.P. Article 3601 states in part:

"An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in any other cases specifically provided by law."